**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In the Matter of the Application of BARNWELL ENTERPRISES LTD and JITENDRA CHHOTABHAI PATEL for an Order Permitting Discovery Under 28 U.S.C. § 1782 | :<br>:<br>:<br>: Civil Action No. _____<br>:<br>:<br>: |

<u>**MEMORANDUM OF LAW IN SUPPORT OF APPLICATION OF BARNWELL ENTERPRISES LTD. AND JITENDRA CHHOTABHAI PATEL FOR AN ORDER PERMITTING DISCOVERY UNDER 28 U.S.C. § 1782**</u>

DUANE MORRIS LLP
505 9th Street, NW, Suite 1000
Washington, DC 20004
(202) 776-7800

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF RELEVANT FACTS ...............................................................2

LEGAL ARGUMENT.........................................................................................21

    I.    The Elements of 1782 ..................................................................... 21

        A.    The Application Must Be Made By An "Interested Person"....................21

        B.    Discovery Must Be For Use In A Proceeding Before A Foreign Or International Tribunal ..................................................................22

        C.    The Person From Whom Discovery Is Sought  Must Reside Or Be Found In The District In Which The Application Is Made.......................22

    II.    Factors Considered By The Reviewing Court ....................................... 23

        A.    Participant In The Foreign Proceeding .....................................24

        B.    Receptivity to U.S. Assistance..................................................24

        C.    Circumvent Limits in Foreign Jurisdiction ................................25

        D.    Discovery Unduly Intrusive or Burdensome ............................26

CONCLUSION...................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Application of Caratube Int'l Oil Co., LLP*, 730 F. Supp. 2d 101 .........................................24

*Burnham v. Superior Court of California*, 495 U.S. 604, 110 S.Ct. 2105 (1990)..................22, 23

*In re Edelman*, 295 F.3d 171 (2d Cir. 2002)................................................................23

*Ht S.R.L. v. Velasco*, 125 F. Supp. 3d 211 (D.D.C. 2015)........................................ 24-25

*Infineon Techs. AG v. Green Power Techs. Ltd.*, 247 F.R.D. 1 (D.D.C. 2005)...........................25

*Intel Corp. v. Advanced Micro Devices*, Inc., 542 U.S. 241, 124 S. Ct. 2466
  (2004)................................................................................................ 21-23

*Minis v. Thomson*, No. 14-91050-DJC, 2014 U.S. Dist. LEXIS 54220 (D. Mass.
  Apr. 18, 2014)........................................................................................26

*In re Thai-Lao Lignite (Thail.) Co.*, 821 F. Supp. 2d 289 (D.D.C. 2011) ..............................23, 26

*In re Veiga*, 746 F. Supp. 2d 8 (D.D.C. 2010) ........................................................22, 25

**Federal Statutes**

28 U.S.C. § 1782 ..............................................................................................*Passim*

Applicants Barnwell Enterprises Limited (f/k/a as Shivaan Enterprises) ("Barnwell"), a Mauritian limited company with a shareholding interest in Spencon International Limited ("Spencon"), and JC Patel, the former Managing Director and co-founder of Spencon (collectively, the "Applicants"), by and through undersigned counsel and pursuant to 28 U.S.C. § 1782 ("1782"), respectfully submit this memorandum of law in support of their application (the "Application") for an order to take expedited discovery from Emerging Capital Partners ("ECP"), headquartered at 1602 L Street, N.W. 6th Floor, Washington, D.C. 20036, for use in litigations currently pending in the courts of Uganda and Mauritius against, *inter alia*, ECP Africa FII Investments LLC ("ECP Africa"), and possibly other proceedings to be filed in East Africa, the United Kingdom and other foreign jurisdictions.

## PRELIMINARY STATEMENT

The Applicants are seeking both documentary and testimonial evidence from ECP to aid in foreign proceedings pending in Mauritius and Uganda and yet to be filed in other foreign jurisdictions against ECP Africa.  The foreign actions involve very serious allegations of negligence, misrepresentation, breach of fiduciary duties, conspiracy to defraud, defamation, libel, fraud, misappropriation, theft, embezzlement, collusion, money laundering and mismanagement against ECP Africa, which conspired to defraud and, eventually, unlawfully seized control of the shares and management of Spencon in 2014.  These actions have driven a once thriving company in East Africa into the ground.

In fact, on or around November 3, 2016, Spencon's main holding company, Spencon Holding Limited, and two of its subsidiaries declared insolvency in Africa.  Declaration of Jitendra Chhotabhai Patel, dated December 21, 2016 ("JC Decl."), ¶ 63; Ex. 6. The evidence so far obtained by the Applicants shows examples of conspiracy to defraud, asset siphoning, bribery payments to government officials, egregious undervaluation and selling of key subsidiary assets,

diversion of asset sale proceeds, complicity with the theft of corporate assets and racial

discrimination towards Spencon's local African employees.

The Applicants believe that ECP has crucial discovery related to its claims against ECP

Africa because several high ranking employees at ECP acted as directors for ECP Africa on

Spencon's Board of Directors at all relevant times.  Thus, ECP should have knowledge,

documents and communications regarding the conduct described below.

This Court should grant the Applicants' Section 1782 petition because: (i) the Applicants

are "interested person[s]" in a foreign proceeding; (b) the proceedings are before foreign

"tribunal[s];" and (c) ECP is located in this district.

## STATEMENT OF RELEVANT FACTS

*About Spencon*

Spencon is a construction company, formed under the laws of the Republic of Mauritius.

It handles infrastructure projects in the Eastern Africa region.  Engineers JC Patel (who is also

the sole shareholder of Barnwell), LR Patel and NP Sharma founded it in 1979.  For more than

30 years, Spencon played a pivotal role in the development of infrastructure projects in the

broader Eastern African region having undertaken more than 200 major road, bridge, water,

sanitation and electrical projects in Kenya, Uganda, Tanzania, Zambia, Malawi, Mozambique,

Rwanda and Southern Sudan generating gross revenues in excess of $1 billion.  *Id.*, ¶¶ 2-3.

*About ECP & ECP Africa*

ECP is a Pan-African private equity firm that purports to have raised over $2 billion

through funds and investment vehicles for growth capital investments in over 40 countries on the

African continent.  ECP claims to have made over 60 investments and completed nearly 40 exits

from its investments.  ECP also claims to have completed deals across a wide variety of sectors

including consumer goods and services, financial services, telecommunications, infrastructure, and agriculture and to have a strong portfolio of remaining transactions. *Id.*, ¶ 4.

ECP Africa is one of ECP's investment vehicles and is the vehicle ECP utilized to make its investment in Spencon. ECP Africa has several notable shareholders including the European Investment Bank, which is the European Union's Bank, and the CDC Group plc, which is a development finance institution owned by the UK government. *Id.*, ¶¶ 5-6.

### *ECP's Investment In Spencon*

In 2005, Spencon's original shareholders (referred to as "Sponsors" or "Sponsor Shareholders") decided to increase the capital base of the company and 'corporatize' the management. Subsequently in 2006 and 2007, ECP invested in Spencon through an entity named EMP Africa Fund II PCC, which later transferred its rights to ECP Africa, in the form of a convertible note. ECP first purchased a $5 million promissory note in September 2006, and later, in March 2007, purchased another $10 million promissory note (collectively, the "Convertible Note Purchase Agreements"). *Id.*, ¶¶ 7-8.

The Convertible Note Purchase Agreements gave a conversion right to ECP Africa to convert all of the aggregate principal amount of the Notes (and all accrued interests thereon) into fully paid, non-assessable common stock at a specific conversion price provided that certain conditions precedent set out in said agreements were satisfied. On or around October 23, 2009, ECP Africa issued a conversion notice pursuant to the Convertible Note Purchase Agreements (the "Conversion"), which resulted in ECP Africa obtaining a stake of Spencon in the amount of approximately 38%. *Id.*, ¶¶ 9-10.

Prior to the Conversion, the shareholding interest in Spencon was as follows (*Id.*, ¶ 11).:

| Name | No. of Shares | % |
|---|---|---|
| Barnwell Ltd. | 10,730,035 | 37 |
| Rishi Ltd. | 10,730,035 | 37 |
| Alok Ltd. | 4,640,000 | 16 |
| GNR Reddy | 1,450,000 | 5 |
| Kiran Saroop Sagaar | 1,450,000 | 5 |

After the Conversion, the shareholding interest in Spencon was as follows (*Id.*, ¶ 12).:

| Name | No. of Shares | % |
|---|---|---|
| Barnwell Ltd. | 10,730,035 | 23.15 |
| Rishi Ltd. | 10,730,035 | 23.15 |
| Alok Ltd. | 4,640,000 | 10 |
| GNR Reddy | 1,450,000 | 3.1 |
| Kiran Saroop Sagaar | 1,450,000 | 3.1 |
| ECP Africa | 17,344,295 | 37.4 |

As part of the Conversion, the following documents were executed: (i) a Put Option

Agreement dated October 23, 2009; (ii) a Share Pledge Agreement dated October 23, 2009

4

(hereinafter referred to as the "Original Share Pledge Agreement"); and (iii) a Shareholders Agreement dated October 23, 2009.  The Put Option Agreement provided that ECP Africa had the right to require the Sponsor Shareholders to purchase all the shares held by ECP Africa in Spencon for a price equaling the conversion price plus a premium of eight per cent (8%), compounded per share per annum.  The Shareholders Agreement gave ECP Africa, a minority shareholder, 50% control of Spencon's board of directors.  *Id.*, ¶¶ 13-15.

Under the Original Share Pledge Agreement, the Sponsor Shareholders pledged their respective shares in Spencon to secure the Sponsor Shareholders' obligations under the Put Option Agreement for the amount of $26,200,000.  Mr. Saggar did not pledge his shares. Instead, he agreed to transfer his shares to Spencon.  His shares were transferred to JC Patel to hold them in trust for the benefit of all shareholders of Spencon until such time as Spencon and its other shareholders agreed on their future transfer.  *Id.*, ¶¶ 16-17. As a result of Mr. Saggar's transfer of shares, the shareholding interest in Spencon changed as follows (*Id.*, ¶ 17):

| Name | No. of Shares | % |
|------|--------------|---|
| Barnwell Ltd. | 11,076,594 | 23.90 |
| Rishi Ltd. | 11,076,594 | 23.90 |
| Alok Ltd. | 4,789,853 | 10.34 |
| GNR Reddy | 1,496,832 | 3.23 |
| ECP Africa | 17,904,482 | 38.63 |

ECP Africa had the Sponsors execute a new Share Pledge Agreement on or around June 11, 2011 (the "New Share Pledge Agreement").  *Id.*, ¶ 18.

*Discovery of Theft & ECP Africa's Failure To Act*

In or around October 2010, Spencon's Internal Auditor reported to one of the audit committee members, Pragnesh Patel, evidence that NP Sharma had stolen approximately $5 million from Spencon.  This theft was confirmed by an external audit and by a law firm. *Id.*, ¶¶ 19-20; Exhs. 1 and 2.

The Applicants desired to take measures to recover the stolen funds from NP Sharma and sought ECP Africa's support to do so.  However, ECP Africa did not support pursuing any actions against NP Sharma.  Upon information and belief, ECP Africa, instead, sought the cooperation of NP Sharma to wrestle control of Spencon from the other Sponsors and sell the company to a third-party entity.  *Id.*, ¶ 26.  Of course, addressing NP Sharma's theft would have disturbed ECP Africa's ability to do so.

The basis of this belief is that in or around August 2011, ECP Africa and the Independent Chairman, without the Sponsors' knowledge or authorization, had approached and offered to sell 100% of Spencon to a company in the United Arab Emirates.  *Id.*, ¶ 27; Exh. 3.  It bears noting that at the time of its communications with the UAE entity, ECP Africa was only a 38% shareholder of Spencon and it did not have the right to sell the company.  In order to sell the company at that time, ECP Africa would have had to increase its shareholding interest in Spencon.  To do so, upon information and belief, it intended to invoke the 'change of control' provision in the Shareholders Agreement and utilize the POA and the pledge agreements it had the Sponsors execute.  *Id.*, ¶ 28.

6

Curiously, around the time ECP Africa was seeking to sell Spencon to a third-party investor, it had the Sponsors execute the New Share Pledge Agreement which included several provisions that were not included in the Original Share Pledge Agreement.  For example, in the New Pledge Agreement, ECP Africa was no longer required to seek court approval or engage in an open auction process before selling Spencon shares.  The New Pledge Agreement also removed a clause that required ECP to return any surplus sale proceeds over the Put Price back to the Sponsors. *Id*., ¶¶ 29-30.

Soon after, ECP Africa's directors, together with the Independent Chairman, created 'the need for a turnaround', fabricated a 'liquidity crisis', grossly exaggerated a minor site malfeasance which they attempted to pin on the Sponsors and even had their US office send the Sponsors threatening letters to 'accelerate the Put option.' All this was intended to coerce the Sponsors into a change of control so that ECP Africa could take nearly 100% of the company. *Id*., ¶ 31.

### Temporary Reconciliation and Subsequent Dispute Between ECP Africa and the Sponsors and the LCIA Arbitration

After the hostile acquisition and exit attempt, JC Patel met with ECP's Co-CEO, Vincent Le Guennou, in late August 2011 to chalk out a way forward where the parties discussed ways to improve the state of the company.  *Id*., ¶ 34.  One of the most promising ways to achieve this was to merge Spencon with another entity JC Patel co-owns called Stirling.  Stirling owned a very substantial judgment against the government of Tanzania, called the Bagamoyo receivable, worth approximately $30 million (at that time), which made the Stirling entity worth over $40 million.  *Id*., ¶¶ 35-36.

JC Patel agreed to a solution that included merging Spencon and Stirling provided that ECP Africa agree to extending their Put Option Agreement.  During several deliberations, ECP

Africa agreed to this in exchange for the merger.  Based on this promise, JC Patel promised to fully assign the Bagamoyo receivable to Spencon and merge Stirling with the company.  *Id.*, ¶¶ 37-38.

Several turnaround proposals were made to ECP Africa between 2011 and 2012. Surprisingly, each and every proposal was rejected.  There are several independent professionals who were consulted during this period who can attest to the viability of the various proposals that were made.  The Applicants believe that if these proposals were adopted, ECP Africa would not only have recovered the Put Price but the Sponsor Shareholders would have retained the controlling stake of Spencon, lenders would have been paid off and the dire state Spencon is in today would have been avoided.  *Id.*, ¶ 40.

However, in mid-2012, after JC Patel committed to merge Stirling and assign Bagamoyo, ECP Africa reneged on its promise to extend the Put Option Agreement and instead informed Sponsors that they would be indeed exercising their rights under the POA.  The Sponsors made several requests to hold shareholders meetings to discuss the Put extension, which ECP Africa ignored.  Also, JC Patel threatened to reverse the commitment he made to merge Spencon with Stirling and assign the Bagamoyo receivable to Spencon if ECP Africa didn't extend the Put Option as was earlier discussed and agreed.  None of these efforts to resolve the matter amicably worked though.  *Id.*, ¶¶ 41-43.

ECP Africa exercised its put right on February 27, 2013 and, on the same day, filed a request for arbitration to the London Court of International Arbitration ("LCIA") (the POA requires disputes to be litigated before the LCIA).  In the arbitration, ECP Africa sought to hold that the POA and other agreements were valid and binding. *Id.*, ¶ 44.

While the arbitration proceedings were still ongoing, on or about June 14, 2013, ECP Africa issued a "Notice of Enforcement Event" to the Sponsor Shareholders under the New Share Pledge Agreement.  On or about August 16, 2013, ECP Africa used the blank share transfer forms to transfer all of the Sponsor Shareholders' Pledged Shares to itself by signing and executing the same as transferee thereof.  This exercise did not concern the shares which the Sponsor Shareholders obtained pursuant to Mr. Saggar's exit, as Mr. Sagaar's shares were never pledged.  *Id.*, ¶¶ 46-48.

Thus, ECP Africa transferred to itself 27,550,070 shares owned by all the Sponsor Shareholders which added to ECP Africa's 17,904,482 shares, a total of 45,454,552 shares out of a total number of 46,344,355 shares, representing 98.08% of Spencon's shareholding.  The fully executed share transfer forms in favor of ECP Africa were communicated to Spencon's Company Secretary at the time.  *Id.*, ¶¶ 49-50.

On or about February 13, 2014, the LCIA gave its award and determined that the Put Option Agreement and the Put Notice claiming the Put Price of $22,446,525 from the Sponsor Shareholders were valid.  As a result the LCIA ordered the Sponsor Shareholders to pay the Put Price with simple interest as from May 28, 2013 (effective date of the put exercise).  *Id.*, ¶¶ 51-52.

### *Transfer of the Sponsors' Shares*

After the LCIA matter concluded, ECP Africa never issued an updated claim to the Sponsors Shareholders demanding the exact amount due by the Sponsor Shareholders pursuant to the arbitration award.  Instead, on or about the February 18, 2014, on the basis of the executed share transfer forms, ECP Africa wrote to Spencon's Company Secretary to proceed with

registering all of the shares of the Sponsor Shareholders in favor of ECP Africa and to register ECP Africa as holder of the said shares in Spencon's books, register and records.  *Id*., ¶¶ 55-56.

By this action, ECP Africa took over the ownership and control of 45,454,552 shares out of a total number of 46,344,355 shares, representing 98.08% of Spencon's shareholding.  Only Mr. Sagaar's shares were left out of this transfer.  On February 21, 2014, the Company Secretary informed the Sponsor Shareholders that it had decided to proceed with the filing of the share transfer forms whereby all the Pledged Shares held by them would be transferred to ECP Africa. Over the objections of Barnwell, Spencon's Company Secretary proceeded to the full implementation of the transfer of the Pledged Shares to ECP Africa.  *Id*., ¶¶ 57-58.

As discussed below, ECP Africa's transfer of the Sponsors' Shares was unlawful.  Worse yet, ECP Africa has illegally exercised rights and control over Spencon and its subsidiaries. Specifically, ECP Africa has, among other things:

- Terminated the office of the managing director and co-founder of Spencon, Mr. JC Patel, who had successfully managed the affairs of Spencon for more than 35 years;

- Terminated the appointment of the directors who were appointed by the Sponsor Shareholders ("Sponsor Directors)";

- Appointed directors (mostly high ranking employees at ECP) who have little to no experience managing a major construction business in East Africa;

- Appointed a person to act as chairman of the board (Grant Ramnauth) who is a suspected associate of Bhadresh Gohil and Lambertus de Boer, both who were convicted for their role in the massive James Ibori money laundering scheme in Nigeria;

- Concealed and failed to act to recover approximately $5 million of misappropriated Spencon assets by co-founder NP Sharma;

- Appointed local junior officers (Marc Sullivan, Ron Series, Andrew Ross and Steve Haswell) with absolutely no knowledge or experience to manage the business and affairs of Spencon; and

- Suspended all pending payments and terminated all payments of salaries, which were due and outstanding to JC Patel, the Sponsor Directors and/or other officers of Spencon appointed by the Sponsor Shareholders.

*Id*., ¶¶ 60-61; Exhs. 4 and 5.

ECP Africa's unlawful conduct has caused, and continues to cause, substantial damage to Spencon and has pushed Spencon to financial ruin.  Barnwell and JC Patel have instituted two proceedings against ECP Africa in Mauritius and Uganda and they are contemplating commencing actions in other foreign jurisdictions.

*Mauritius Action*

On May 20, 2015, Barnwell filed an action in the Supreme Court of Mauritius, Commercial Division, against, among others, ECP Africa.  The action alleges, *inter alia*, that ECP Africa "wrongfully and unlawfully and criminally misappropriated the Sponsors Shareholders' Pledged Shares in Spencon, so that [ECP Africa]'s shareholding is tainted with fraud and illegality, in circumstances amounting to embezzlement." The basis for Barnwell's claim that the transfer of shares was illegal is enumerated in Mauritian law.  The complaint alleges that, pursuant to Mauritian law (the governing law of the Pledge Agreements), "[ECP Africa] had no right to execute the blank share transfer forms in its favour and transfer the Pledged Shares to itself so as to appropriate the said shares with the ultimate aim to appropriate Spencon." According to the complaint,  under Mauritian law, the "holder of a blank share form gives no right or blanket right or authorization to the holder of the blank share transfer forms to transfer the said shares of itself and, to worsen matters in this case, so as to take over and take control of the company in which the pledged shares are held."  Barnwell is seeking declaratory relief and damages caused by ECP Africa's illegal management of Spencon.  The matter is pending.  *Id*., ¶¶ 65-69; Exh. 7.

### *Uganda Action*

On August 30, 2016, JC Patel filed an action in the High Court of Uganda at Kampala against ECP Africa and other defendants for, among other things, fraud and mismanagement. The suit alleges that Spencon had a considerable amount of business and assets in Uganda as of 2014. Since ECP Africa took control of the company, it has perpetuated financial fraud against Spencon putting it in a calamitous financial condition threatening its very existence. *Id.*, ¶¶ 70-72; Exh. 8.

### *ECP Africa's Reckless and Illegal Management of Spencon*

Barnwell and JC Patel have evidence of extraordinary acts of ECP Africa's mismanagement and wrongful conduct including: (i) siphoning of Spencon assets; (ii) improper and fraudulent payments to third-parties; (iii) the sale or potential sale of valuable subsidiary assets for substantially below market value; (iv) siphoning of plant sale proceeds to proxies acting for ECP; (v) failure to take actions to recover millions of dollars of misappropriated assets; (vi) mistreatment of Spencon employees; and (vii) payment of bloated salaries to ECP Africa appointed managers and officers with no evidence of return.

### *Siphoning of Spencon Assets*

The current CEO of Spencon, Andrew Ross ("Ross"), and CFO, Steve Haswell ("Haswell"), were both appointed by ECP Africa to run the day-to-day operations of Spencon. ECP has directed these officers to strip Spencon of valuable assets. Specifically, under ECP's watch, Ross and Haswell created a new corporation on September 8, 2016 called Construction Resources Africa Limited ("CRA"). Upon information and belief, CRA was created to transfer valuable assets away from Spencon. Barnwell and JC Patel have evidence of several valuable

company vehicles being transferred from Spencon to CRA.  Current staff members attest that Spencon did not receive any consideration for these transfers.  *Id*., ¶¶ 74-76.

The Applicants also have evidence of other Spencon assets being transferred for substantially less than their fair market value.  Specifically, they have evidence of assets worth approximately $6 million being sold to third-parties for $1.3 million.  Even more alarming, the proceeds of the sale of assets were diverted away from Spencon and deposited with an individual of dubious reputation in the region known as Manoj Kumar "Tony" Sanghani ("Sanghani") who is suspected to be acting as a proxy for ECP, Ross, and Haswell.  Barnwell and JC Patel believe that additional unofficial cash payments have been paid by the buyers to Sanghani on behalf of ECP, Ross, and Haswell.  *Id*., ¶¶ 77-78.

It also appears that ECP Africa's appointed CEO and CFO, Ross and Haswell, entered into an agreement with Sanghani dated June 16, 2015 pursuant to which Spencon promised to pay him a guaranteed sum of $195,000 for his services in helping Spencon recover a property called "Kasarani" to the company.  *Id*., ¶ 80; Exh. 14.   There is more information about this property below but it appears that this agreement was yet another means to embezzle funds away from Spencon because there was no need to recover Kasarani.  Kasarani is and was owned by one of Spencon's subsidiaries (Spedec) and Spencon owned 51% of Spedec.  *Id*.

Additionally, ECP Africa's appointed CEO and CFO, Ross and Haswell, entered into an agreement with Sanghani and NP Sharma dated July 8, 2015, pursuant to which NP Sharma, with the assistance of Sanghani, would sell certain assets to help pay off Spencon debt.  *Id*., ¶ 81.  According to the agreement, Spencon would pay Sharma certain sums of money for his efforts.  Of these payments to Sharma, Sanghani was promised a 15% cut.  It is unclear what services Sanghani could possibly have provided to help Spencon implement turnaround measures.  *Id*.

There is another agreement between NP Sharma and Spencon, dated July 8, 2015, promising to pay NP Sharma approximately $2.1 million, evidently in connection with his services in selling assets to help Spencon pay its debts.  *Id*., ¶ 82; Exh. 16.  As noted above, this is the very same NP Sharma that ECP Africa was aware had already stolen approximately $5 million from Spencon.

Upon information and belief, none of the assets sold were actually used to pay Spencon debt.  Instead, it is believed that Sanghani and Sharma were acting as proxies for ECP Africa, Ross and Haswell in order to divert valuable assets away from Spencon knowing that insolvency was imminent.  Notably, within weeks of Spencon subsidiaries declaring insolvency, Ross and Haswell fled Kenya and have not been seen at Spencon since.  *Id*., ¶¶ 84-86.

### *Improper Bribe Payments to Government Officials*

Since ECP Africa took control of Spencon in 2014, Spencon has paid approximately $4 million to third party entities in Uganda named Katchung Technical Services ("KTS") and KAKS Limited ("KAKS").  These companies are described as "debt collection" agencies.  However, these companies are not known debt collectors in the region.  It is believed that these companies acted as conduits to facilitate the payment of bribes to government officials in Uganda.  The evidence that these payments were bribes is as follows:

- KTS and Spencon entered into a Mandate Agreement dated March 12, 2014.

- F. Okori, a driver at Spencon, who is not a debt collector, signed the Mandate Agreement on behalf of KTS.

- F. Okori told another Spencon employee that he was instructed, by the current ECP Africa appointed head of business development at Spencon, to have KTS open an account at Diamond Bank to deposit funds to be used to make bribe payments to foreign officials at the Ministry of Education.

14

- F. Okori told the employee that on or around March 19, 2014, he withdrew $166,000 and provided the money to the current ECP Africa appointed head of business development in Uganda, who, in turn, stated that he intended to give the money to a public official at the Ministry of Education.

- Weekly budgets described the payment to KTS as "Extra Materials" ("EM"), a common phrase used for bribe payments in East Africa.

- Approximately $1 million was paid to KTS in 2014.

- Marc Sullivan (the former ECP Africa appointed CEO of Spencon) described KAKS as a debt collection agency in Uganda that Spencon had a relationship with spanning several years.  This is not true.  Spencon had no prior dealings with KAKS.

- Approximately $3 million was paid to KAKS in 2015.

*Id.*, ¶¶ 87-90; Exhs. 17-22.

Several employees at Spencon have confirmed that the payments to KTS and KAKS were in fact bribe payments that were made at the direction of ECP Africa agents.  *Id.*, ¶ 91.

In addition to the evidence above, the payments to KTS and KAKS were in violation of ECP's own anti-bribery policy ("ABP").  The ECP ABP specifically prohibits the use of intermediaries, like KTS and KAKS, to pay bribes.  The policy sets forth a specific protocol with regards to contracts with third-parties.  It requires that: (i) all such agreements be in writing, including identifying the amount and kind of compensation to be paid; (ii) certifications be obtained from the third party that it will observe all applicable laws as well as the prescriptions of the anti-bribery laws (like the Foreign Corrupt Practices Act) or local equivalent thereof; (iii) the contract document the qualifications of the third party; (iv) the contract permit termination of the agreement for violating anti-bribery or other laws; and (v) independent audits of financial records of the third-party be permitted.  *Id.*, ¶¶ 91-93; Exh. 23.  The KTS agreement clearly does not comply with ECP's own ABP policy. *Id.*, ¶ 94; Exh. 17.

These are not the only bribe payments ECP Africa has made or authorized either.  ECP Africa also offered to pay the Criminal Investigation Division (the "CID") in Kenya approximately $1 million to bring a criminal case against JC Patel's son, Pragnesh Patel, in retaliation to the Mauritian Action, and to coerce Pragnesh Patel to hand over a $20 million land asset and ultimately drop the Mauritian Action.  *Id*., ¶¶ 91-95.

<u>Undervaluation and Potential Sale of Subsidiary Asset</u>

One of Spencon's subsidiaries is an entity named Spedec.  Spencon owns 51% of Spedec and the remaining 49% is owned by JC Patel's son, Pragnesh Patel.  Spedec is a real estate development company.  Its most valuable asset is a parcel of property in Kenya called "Kasarani."  In 2014, the appraised value of the property was approximately $20 million.  At the time the parties dispute before the LCIA began, Spedec was in the final stages of commencing a substantial development project on the Kasarani property, which, when complete, would have an estimated sale value of $200 million and projected net profitability of $40 million.  As an act of retaliation against the Patels, ECP Africa withdrew its support of Spedec and its Kasarani project and tried to claim that Spedec did not own the Kasarani land or project.  This egregious act alone has caused great damage to Spencon, which would have benefited from the development of Kasarani.  In August 2015, Spencon (acting through ECP Africa appointed CEO Andrew Ross) entered into an agreement confirming Spedec's ownership of Kasarani demonstrating the frivolity and wrongfulness of ECP Africa's prior position regarding the property's ownership. *Id*., ¶¶ 96-100; Exh. 24.

In or around December 2015, Ross informed Pragnesh Patel that ECP wanted to sell Spencon's 51% interest in Spedec.  He offered to sell Spencon's interest to Pragnesh Patel for $1 dollar, provided the Mauritian lawsuit and other actions were withdrawn.  Additionally, Ross

threatened to sell Spencon's shares in Spedec to the Akasha family, an organization reputed to be a part of the heroin supply chain that stretches from the poppy fields of Afghanistan through east Africa to the cities of Europe and the United States.  The U.S. DEA has investigated the family for years.  It is believed that Ross conveyed this ultimatum to Pragnesh Patel hoping that he would motivate JC Patel to drop the Mauritian Action against ECP Africa.  *Id.*, ¶¶ 102-105; Exhs. 25-26.

Pragnesh Patel had his counsel in Mauritius send a letter to Ross instructing him to cease all efforts to sell Spencon's interest in Spedec.  *Id.*, ¶ 106; Exh. 27.  However, it is believed that Ross continues to offer to sell Spencon's interest in Spedec for substantially less than its market value, or may have already sold the interest for an egregiously low amount.  It is believed that ECP Africa, acting through Ross, was orchestrating a sale of Spencon's various assets to proxies (like Sanghani or possibly the Akashas) knowing that insolvency was imminent.  *Id.*, ¶¶ 107-108.

### *Failure to Recover Millions of Dollars of Stolen Company Money*

Since at least October 2010, ECP Africa has known that co-founder NP Sharma stole approximately $5 million from Spencon.  ECP Africa was provided with internal and external audit reports and obtained legal opinion, all confirming the theft.  At the time of the discovery, the Patels were directors of Spencon and they requested that, as the remaining sponsor shareholders and ECP, a 38% shareholder, take action to recover the stolen funds. *Id.*, ¶¶ 109-111.

However, ECP Africa, which controlled 50% of Spencon's board, refused to take any action.  Instead, they took NP Sharma's support in 2011, all the while conspiring with him to defraud the remaining Sponsors of their shares. After ECP Africa took full control of Spencon in 2014, they continued to take no action against NP Sharma to recover the stolen funds.  Rather,

ECP Africa has forged an even closer relationship to him, entering several agreements that promise to pay him millions.  The Applicants have evidence of at least one payment of $150,000 to NP Sharma. *Id*., ¶¶ 112-116; Exh. 28.

### *Mistreatment of Spencon Employees*

Barnwell and JC Patel have also been informed that several employees have filed claims against Spencon for alleged rampant racism and discrimination.  The allegations focus on ECP Africa appointed officers Ross and Haswell and their European management team, who have regularly failed to pay African employees their wages, but have never once failed to pay themselves their bloated salaries costing the company approximately $250,000 per month.  The complaints also allege that Ross, in particular, treated the local staff in "colonial-like" derogatory manner, and often ranted at them, in public, using racist words and profanity.  *Id*., ¶¶ 117-119; Exh. 29.

### *Exorbitant Salaries for Inexperienced and Ineffective Officers and Managers*

After ECP Africa transferred the Sponsors' shares to itself through deception and in contravention of Mauritian law, ECP Africa ousted the Sponsors and their appointed directors from the board of directors and from the management of the company.  ECP Africa's reconstituted board and management, consisting of people who are largely incompetent, deceitful, fraudulent and completely unsuitable to run Spencon, has effectively destroyed Spencon.  These officers and managers, consisting mostly of European expats, are draining Spencon a whopping $250,000 per month in salaries and other perks, such as luxury cars, armed body guards, frequent international paid holidays, business class travel, etc.  This is a grotesquely greater sum than Spencon's prior officers and managers ever earned.  *Id*., ¶¶ 120-123.

Moreover, the new officers and managers appointed by ECP Africa have been hopelessly ineffective as well.  At the time ECP Africa unlawfully seized control of Spencon, the company was registering new annual business worth about $75 million.  Since 2014, Spencon has registered less than $5 million per annum, if that. *Id.*, ¶¶ 124-125.

<u>*Why Discovery is Being Sought from ECP in the U.S.?*</u>

The Applicants believe that ECP has discoverable information because several of the ECP Africa directors on Spencon's board are high ranking ECP employees. ECP Africa appointed the following directors to Spencon's board: Carolyn Campbell, Bryce Fort, Andrew Brown, and Namita Shah.

Carolyn Campbell is a Managing Director and Founding Partner of ECP. According to ECP's website, Ms. Campbell provides management oversight of the firm's operations and investments. Ms. Campbell is also a member of ECP's Executive Committee and of the Funds' investment committees. Ms. Campbell is an attorney and is based in Washington D.C.

Andrew Brown is a Managing Director and the Chief Investment Officer for ECP. According to ECP's website, Mr. Brown is responsible for overseeing the firm's investment processes including deal sourcing, transaction execution, investment management, and exits. The ECP website highlights that he currently serves as Chairman of the board of Spencon.

Bryce Fort is a Managing Director and Founding Partner of ECP.  According to ECP's website, Mr. Fort is responsible for identifying, analyzing, and recommending investments, performing due diligence, and leading transaction teams. Mr. Fort is also deeply involved with operations and strategies related to the ECP Management Company.

Namita Shah is a Vice President and Head of Environmental, Social, and Governance (ESG) matters at ECP in Nairobi, Kenya. According to ECP's website, her immediate

responsibilities relate to special projects concerning fund management, one of which includes

effective management of environmental, social, and governance issues. As the Head of ESG, Ms.

Shah ensures appropriate due diligence on prospective transactions and helps establish ESG

goals for prospective portfolio companies. Her online biography states that she serves on the

board of Spencon and its subsidiaries. *Id.*, ¶¶ 126-131.

It is worth noting that Alex-Handrah Aime, who is a managing director at ECP, also

served as a director at Spencon from approximately 2009 and 2011 and had knowledge of NP

Sharma's theft.  Upon information and belief, she played a critical role in ECP Africa's response

to the discovery of the theft.

It is believed that these ECP directors (the "ECP Directors") have participated in,

approved of, consented and/or acquiesced to the decisions that have destroyed Spencon and the

Applicants.  For example, ECP Directors had knowledge of and approved payments to the third-

parties KTS and KAKS.  Specifically, ECP Director Namita Shah signed off on payments to

KTS and KAKS and several ECP Directors discussed payments to KAKS by email.  *Id.*, ¶ 134;

Exhs. 19, 21 and 22.  Additionally, ECP Directors Campbell and Shah are both listed as ECP's

ABP compliance officers.  *Id.*, Exh. 23.

Incidentally, this is not the first time that ECP's investment practices and apparent

complicity with corruption and illegality have been called into question.  The watchdog

organizations known as The Corner House and Counter Balance published a briefing paper

regarding ECP's involvement in a major case of money laundering in Nigeria.  ECP, through

ECP Africa, invested in three Nigerian companies (Oando, Notore and Intercontinental Bank)

which were allegedly used for a massive money laundering scheme by the former Governor of

Nigeria's oil rich Delta State, James Ibori.  After an extensive investigation, The Corner House

and Counter Balance concluded that "ECP had either not conducted adequate due diligence

before investing in the companies or was deliberately closing its eye to the links to Ibori's

corruption and money laundering for its own benefit." *Id.*, ¶¶ 135-136; Exh. 30.

## LEGAL ARGUMENT

### I.    The Elements of 1782

The text of 1782 provides, in pertinent part, that:

> The district court of the district in which a person resides or is
> found may order him to give his testimony or statement or to
> produce a document or other thing for use in a proceeding in a
> foreign or international tribunal, including criminal investigations
> conducted before formal accusation. The order may be made…
> upon the application of any interested person and may direct that
> the testimony or statement be given, or the document or other thing
> be produced, before a person appointed by the court.

In essence, an applicant under Section 1782 needs to show three things: (a) it is an

"interested person" in a foreign proceeding; (b) the proceeding is before a foreign

"tribunal;" and (c) the person from whom evidence is sought is in the district of the court

before which the application has been filed.  The type of evidence that may be obtained

under Section 1782 includes both documentary and testimonial evidence.

The Applicant here unquestionably satisfies each of these elements.

### A.    The Application Must Be Made By An "Interested Person"

The case law defines an "interested person" broadly.  In fact, an interested person does

not even need to be an official party to the proceeding.  *Intel Corp. v. Advanced Micro Devices,*

*Inc.*, 542 U.S. 241, 247 (2004).

The Applicants in this matter are plaintiffs in foreign proceedings in Mauritius and

Uganda.

B.      Discovery Must Be For Use In A Proceeding Before A Foreign Or International
        Tribunal

The case law states that the proceeding does not need to be filed and pending, the

proceeding must simply be in "reasonable contemplation" at the time the discovery is sought.

*Intel Corp.*, 542 U.S. at 247.  Moreover, the Supreme Court has noted that the proceeding need

not be a "judicial" proceeding in order to qualify under Section 1782(a*). Intel Corp. v. Advanced*

*Micro Devices, Inc*., 542 U.S. at 258 ("Section 1782 had previously referred to 'any judicial

proceeding.' The Rules Commission's draft, which Congress adopted, replaced that term with 'a

proceeding in a foreign or international tribunal.'…Congress understood that change to provide

the possibility of U. S. judicial assistance in connection with administrative and quasi-judicial

proceedings abroad….") (citing S. Rep. No. 1580, at 7-8) (internal quotations omitted). Courts

have interpreted this requirement broadly to include arbitration proceedings. *In re Veiga*, 746 F.

Supp. 2d 8, 22-23 (D.D.C. 2010) (holding that "BIT Arbitration falls within the metes and

bounds of § 1782(a)" where the arbitration at issue was being conducted under the Bilateral

Investment Treaty between the United States and Ecuador and under UNCITRAL rules and

therefore qualified as a "foreign or international tribunal" under the statute.).

The Applicants satisfy this element as well because the discovery they seek relates to

actions that have already been filed in Mauritius and Uganda and may be used in other yet to be

filed foreign proceedings against ECP Africa.

C.      The Person From Whom Discovery Is Sought  Must Reside Or Be Found In The
        District In Which The Application Is Made

The courts have interpreted this requirement broadly.  One court explained that mere

physical presence is enough to satisfy the requirement:

> [T]he question of what it means to be found in a particular locale is
> already the subject of well-settled case law on territorial
> jurisdiction. In *Burnham v. Superior Court of California*…the

> Supreme Court authorized the exercise of personal jurisdiction based on nothing more than physical presence…It is consistent construction to endow the phrase 'or is found' in § 1782 with the same breadth as that accorded it in *Burnham*.

*In re Edelman*, 295 F.3d 171 (2d Cir. 2002), (citing *Burnham v. Superior Court of California*, 495 U.S. 604, 110 S. Ct. 2105 (1990)) (plurality opinion).

Where the respondent is a corporation, courts will consider the entity's place of incorporation and principle place of business in determining whether the corporation "resides" or is "found in" the district. *See In re Thai-Lao Lignite (Thail.) Co.*, 821 F. Supp. 2d 289, 294-95 (D.D.C. 2011) (holding that "Absent any such assertions,[that Respondent has any contacts with the District of Columbia] the Court is reluctant to infer that a Delaware company headquartered in Maryland has the requisite contacts to be found in or to reside in this district.").

Here, ECP is headquartered and has its principle place of business in Washington, D.C.

## II.   Factors Considered By The Reviewing Court

In addition to the statutory elements set forth above, which are clearly satisfied, the following considerations are important to a district court tasked with reviewing an application: (i) whether the person from whom discovery is sought is a participant to the foreign proceeding; (ii) the nature of the tribunal, the character of the proceeding, and the receptivity of the foreign court or agency to U.S. federal-court judicial assistance; (iii) whether the discovery request seeks to circumvent applicable discovery limits in the foreign jurisdiction; (iv) whether the discovery requests are "unduly intrusive or burdensome." *See Intel Corp. v. Advanced Micro Devices*, Inc., 542 U.S. 241, 124 S. Ct. 2466 (2004).

These factors weigh in favor of granting the Application.

A.      Participant In The Foreign Proceeding

It is generally more difficult for the foreign tribunal to order the production of discovery

from a foreign nonparticipant than from a party. Therefore,

> when the person from whom discovery is sought is a participant in
> the foreign proceeding . . . the need for § 1782(a) aid generally is
> not as apparent as it ordinarily is when evidence is sought from a
> nonparticipant in the matter arising abroad. A foreign tribunal has
> jurisdiction over those appearing before it, and can itself order
> them to produce evidence…In contrast, nonparticipants in the
> foreign proceeding may be outside the foreign tribunal's
> jurisdictional reach; hence, their evidence, available in the United
> States, may be unobtainable absent § 1782(a) aid.

*Intel Corp.*, 542 U.S. at 264 (2004).  This factor weighs in favor of applications seeking

discovery from non-participants in a foreign proceeding because ECP is not a participant in the

actions in Uganda or Mauritius.

B.      Receptivity to U.S. Assistance

A foreign tribunal's receptivity to judicial assistance through 28 U.S.C. § 1782(a)

generally weighs in favor of permitting the discovery. *See Ht S.R.L. v. Velasco*, 125 F. Supp. 3d

211, 224 (D.D.C. 2015) (citing *In re Application of Caratube Int'l Oil Co., LLP*, 730 F. Supp. 2d

101, 105). However, courts do not require "an extensive examination of foreign law regarding

the existence and extent of discovery in the forum country…in order to ascertain the attitudes of

foreign nations to outside discovery assistance." *In re Caratube Int'l Oil Co., LLP*, 730 F. Supp.

2d at 105 (D.D.C. 2010) (citing *In re Application of Euromepa, S.A.*, 51 F.3d 1095, 1099 (2d Cir.

1995)); *see also Intel Corp.*, 542 U.S. 241 at  246 ("Section 1782 does not direct United States

courts to engage in comparative analysis to determine whether analogous proceedings exist here.

Comparisons of that order can be fraught with danger."). Rather, courts have interpreted this

factor to require that "a district court's inquiry into the discoverability of requested materials

should consider only authoritative proof that a foreign tribunal would reject evidence obtained

with the aid of section 1782." *Id*.  Ultimately, it is "[t]he party resisting the discovery [that] bears

the burden of proving 'that the foreign tribunal would reject the evidence sought.'" *Ht S.R.L. v.*

*Velasco*, 125 F. Supp. 3d 211, 224 (D.D.C. 2015) (citing *In re Veiga*, 746 F. Supp. 2d at 23-24).

      Here, there has been no discovery in the foreign proceedings nor would the tribunals in

Uganda and Mauritius reject discovery obtained from ECP in connection with Applicants' fraud

and mismanagement claims against ECP Africa.

      C.    Circumvent Limits in Foreign Jurisdiction

      Generally, a 1782 proceeding that seeks to circumvent discovery limitations imposed by

a foreign tribunal are not favored. *See Intel Corp.*, 542 U.S. at 246. However, "[i]t is irrelevant if

the material sought is not discoverable in the foreign tribunal because 28 U.S.C. § 1782(a) does

not impose a foreign-discoverability requirement. *Ht S.R.L. v. Velasco*, 125 F. Supp. 3d at 225

(citing *Intel*, 542 U.S. at 253). In fact, the U.S. Supreme Court has held that Section 1782

contains no threshold requirement that the evidence sought in a 1782 proceeding be discoverable

under the law of either the district court or the foreign proceeding.  *See Intel*, 542 U.S. at 246.

Courts have viewed discovery sought that has been specifically prohibited in the foreign court as

suggestive of a petitioner attempting to circumvent discovery limitations in the foreign district.

*See Minis v. Thomson*, No. 14-91050-DJC, 2014 U.S. Dist. LEXIS 54220, at *11-12 (D. Mass.

Apr. 18, 2014); *See also Infineon Techs. AG v. Green Power Techs. Ltd.*, 247 F.R.D. 1, 5

(D.D.C. 2005).  However, even "[i]f the material sought is discoverable in the foreign tribunal,

litigants are not required to seek discovery through the foreign tribunal prior to requesting

through the United States…." *Ht S.R.L. v. Velasco*, 125 F. Supp. 3d 211, 226 (D.D.C. 2015).

      This is not a factor in the present Application since there are no discovery limitations that

have been imposed by the foreign tribunals.

D.      Discovery Unduly Intrusive or Burdensome

The discovery sought in a 1782 application has to be tailored so that the request does not impose an unreasonable burden. *See In re Thai-Lao Lignite (Thail.) Co.*, 821 F. Supp. 2d 289, 293 (D.D.C. 2011) (citing *Intel*, 542 U.S. at 265) ("[U]nduly intrusive or burdensome requests may be rejected or trimmed.").

The discovery sought by the Applicants is not intrusive or burdensome and is highly relevant to the pending proceedings and the other yet to be filed proceedings that Applicants are contemplating commencing against ECP Africa.  Applicants seek discovery pertaining to the conduct set forth above.  Specifically, Applicants seek oral and documentary (documents and communications) evidence regarding:

- NP Sharma's misappropriation of Spencon funds and decisions related to how to respond to the theft;

- Payments to NP Sharma since 2014 and reason for payments;

- Offer to sell Spencon to Delma or any other third-parties between 2009 and present;

- Decision to appoint Grant Ramnauth, Carolyn Campbell, Namita Shah, Andrew Brown, Bryce Fort, Marc Sullivan, Ron Series, Andrew Ross and Steve Haswell to the Board of Directors;

- Payments made to all directors, managers and officers since 2014;

- Expenses charged to Spencon by directors, officers and managers since  2014;

- All bids submitted for new business and new contracts obtained since 2014;

- Spencon revenue and expenses since 2014;

- Formation of CRA;

- Sale of Spencon assets to CRA or any other third-party entity;

- Business dealings with Sanghani or the Akashas;

- Agreements with Sharma, Sanghani or the Akashas;

- Sale of Spencon assets;

- Anti-Corruption policies promulgated and distributed at Spencon since 2014;

- Anti-Corruption training of employees at Spencon since 2014;

- Agreements with KAKS and KTS;

- Payments between Spencon and KTS and KAKS;

- All other "debt collectors" and third-party intermediaries that received payments from Spencon or any of its subsidiaries since 2014;

- Searches for "Politically Exposed Persons" by ECP related to KAKS, KTS or any other third-party entity since 2014;

- Communications with CID regarding Spedec or Kasarani;

- Offers to sell or sale of Spencon's interest in Spedec;

- Offers to sell or sale of Kasarani; and

- Efforts to implement turnaround measures at Spencon.

A copy of the proposed subpoena is attached as Exhibit A to this memorandum.

## **CONCLUSION**

For the reasons set forth above, the Application should be granted and the Petitioners, through counsel, should be permitted to issue and serve the subpoena on ECP.

Respectfully Submitted,

DUANE MORRIS LLP

By: _____

Joseph S. Ferretti, D.C. Bar No. 485996
505 9th Street, NW, Suite 1000
Washington, DC 20004-2166
P: 202.776.7863
F: 202.478.2811
jsferretti@duanemorris.com

Evangelos Michailidis (pro hac vice
application to be submitted)
1540 Broadway
New York, NY 10036
F: 212.692.1000
emichailidis@duanemorris.com

Dated:  December 21, 2016                              *Attorneys for Barnwell Enterprises Limited
and JC Patel*

# EXHIBIT A

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| Barnwell Enterprises Ltd and JC Patel | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No. |
| Emerging Capital Partners | ) | |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                    Emerging Capital Partners

_(Name of person to whom this subpoena is directed)_

☑ _Testimony:_ **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
Please see attached Schedule A.

| Place: Duane Morris LLP | Date and Time: |
|---|---|
| 505 9th Street NW, Suite 1000 Washington, DC 20004 | 01/25/2017 10:00 am |

The deposition will be recorded by this method:   Stenographer and videographer

☑ _Production:_  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

Please produce materials by January 18, 2017 designated in Schedule A.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

            _CLERK OF COURT_

                                        OR

_____          _____
_Signature of Clerk or Deputy Clerk_                _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ Barnwell Enterprise Ltd and JC Patel
_____, who issues or requests this subpoena, are:
Joseph S. Ferretti of Duane Morris LLP, 505 9th Street NW, Suite 1000, Washington, DC 20004.

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3) *Quashing or Modifying a Subpoena.***
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

## DEFINITIONS

As used herein:

1.      "ECP" refers to Emerging Capital Partners ("ECP"), its agents, employees, affiliates, counsel, subcontractors, representatives and all other persons or entities acting or purporting to act on his behalf.

2.      "ECP Africa" ECP Africa FII Investments LLC, its agents, employees, affiliates, counsel, subcontractors, representatives and all other persons or entities acting or purporting to act on his behalf.

3.      "Spencon", "NP Sharma", "KTS", "KAKS", "Kasarani", "Spedec", "Sanghani", the "Akashas", "CRA", and "CID" shall be given the same meaning here that are provided in the moving brief and declaration in support of the 28 U.S.C. § 1782 application.

4.      As used herein, "documents," regardless of origin, source or location (includes electronically stored information), means, refers to and includes all writings of any kind whatsoever, including, but not limited to, handwriting, typewriting, printing, photostating, photographing, and any and every kind and means of recording upon any tangible thing, and form of communication or representation, including any data compilation from which information can be translated, and includes, but is not limited to, the originals, copies, and non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, if necessary, through electronic devices into reasonably usable form, as well as any tangible thing that constitutes or contains matters within the scope of the Federal Rules of Civil Procedure.

5.      As used herein, the term "communication" means the transmittal of information in the form of facts, ideas, inquiries or otherwise, by or in any manner whatsoever, including,

without limitation, conversations, meetings, discussions, and other verbal exchanges or interactions, whether in person, by telephone or in writing, including emails and text messages.

6.      As used herein, "all documents and communications" means, refers to and includes every document and communication, as defined hereinabove, that can be located, discovered or obtained by reasonably diligent efforts, including, without limitation, (a) documents and communications in your possession, custody or control; (b) documents and communications within the possession, custody or control of your agents, attorneys, accountants, or other persons acting on your behalf; (c) documents and communications that you can obtain by request; and/or (d) documents and communications that you have a legal right to bring within your possession, custody or control by demand or upon request.

7.      As used herein, the term "concerning" means relating, concerning, referring to, describing, evidencing or constituting.

8.      As used herein, "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

9.      The singular includes the plural and the plural includes the singular.

## INSTRUCTIONS

1.      The document requests set forth below, also referred to herein as "demands," are attempts to obtain all relevant information regarding the matters set forth herein.  None of the terms defined above is intended to limit the scope of the demands or your response thereto; rather, each term is to be interpreted in the broadest and most inclusive sense possible in the context of each demand and the above-captioned action.

2.      If your response to any Document Request consists, in whole or in part, of an objection founded upon any type of privilege or immunity, or if any Document Request is deemed to call for the

production of attorney-client privileged or attorney work product materials, and such privilege or work product is asserted, provide the following information:

(a)    The reason for not disclosing the document;

(b)    A statement of the basis for the claim of privilege, work product or other ground of nondisclosure; and

(c)    A brief description of the privileged document, including:

    i.    The date of the document;

    ii.    The number of pages, attachments, and appendices;

    iii.    The name(s) of its author, authors or preparers and an identification by employment and title of each such person;

    iv.    The name of each person who was sent, shown or blind or carbon copied the document, or has had access to, possession or custody of the document, together with an identification of each such person;

    v.    The present custodian of the document; and

    vi.    he subject matter of the document, and in the case of any document relating or referring to a meeting or conversation, identification of such meeting or conversation.

3.    If any document responsive to any Document Request has been transferred, lost, discarded or destroyed, or is otherwise incapable of production because of your inability to obtain same, please provide the following information:

(a)    The date or approximate date it was transferred, lost, discarded or destroyed;

(b)    The circumstances and manner in which it was transferred, lost, discarded or destroyed;

(c)    The reason for transferring, losing, discarding or destroying the document;

(d)    The identity of all persons authorizing, or having knowledge of the circumstances surrounding, the transfer, loss, discarding or destruction of the document;

(e)    The identity of the person(s) who transferred, lost, discarded or destroyed the document;

(f)     The identity of all persons having knowledge of the contents of the document;

(g)     The author(s) of the document;

(h)     The date, subject matter, type and number of pages of the document; and

(i)     The sender and recipients or intended recipients of the document.

4.     You are requested to produce electronically stored information as single-page TIFF images with an OPT load file, preserving the document boundaries, along with a DAT load file that includes all metadata and parent/child relationships.  Where possible, you are requested to provide OCR in document-level TXT file format, along with an OCR Path field within the aforementioned DAT file. For any Excel, PowerPoint, or large format files, please also provide the native file in addition to the TIFF rendering with a native file path reference within the DAT load file.

## DOCUMENTS REQUESTED

1.     All documents and communications concerning NP Sharma's misappropriation of Spencon funds.

2.     All documents and communications concerning payments to NP Sharma since 2014.

3.     All agreements entered into with NP Sharma since 2014.

4.     All documents and communications concerning efforts to sell Spencon to any third-parties between 2009 and present.

5.     All documents and communications concerning the appointment of Grant Ramnauth, Carolyn Campbell, Namita Shah, Andrew Brown, Bryce Fort, Marc Sullivan, Ron Series, Andrew Ross and Steve Haswell to Spencon's Board of Directors.

6.     All documents and communications concerning payments made to directors, managers and officers of Spencon since 2014.

7.      All documents and communications concerning expenses charged to Spencon by directors, officers and managers since 2014.

8.      All documents and communications concerning bids submitted by Spencon for new business and new contracts obtained since 2014.

9.      All documents and communications concerning CRA.

10.     All documents and communications concerning the sale of Spencon assets to CRA or any other party.

11.     All documents and communications concerning Sanghani.

12.     All documents and communications concerning the Akashas.

13.     All documents and communications concerning anti-corruption/anti-bribery policies distributed at Spencon since 2014.

14.     All documents and communications concerning KAKS and KTS.

15.     All weekly budgets reviewed by ECP Directors.

16.     All documents and communications concerning other debt-collection agencies.

17.     All documents and communications between GN Reddy and ECP Directors since 2014 concerning KTS, KAKS or any other debt-collection vendors.

18.     All documents and communications concerning due diligence conducted prior to authorizing payments to KTS, KAKS or any other vendors.

19.     All documents and communications with the CID concerning Spedec or Kasarani and the Patels.

20.     All documents and communications concerning Spencon's interest in Spedec.

21.     All documents and communications concerning Kasarani.